# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION

**KAREN CORDER,**

    **Plaintiff,**

    v.

**THE DEFENSE FINANCE AND ACCOUNTING SERVICE,** *et al.*,

    **Defendants.**

Case No.: 2:14–CV–314
JUDGE SMITH
Magistrate Judge Jolson

## OPINION AND ORDER

This matter is before the Court upon the Motion for Summary Judgment of Defendants the Defense Finance and Accounting Service ("DFAS") and General Jim Mattis, Secretary of Defense[1] (Doc. 41). Plaintiff opposed Defendants' Motion (Doc. 42) and Defendants replied in support (Doc. 44). The Motion is now ripe for review. For the following reasons, Defendants' Motion is **DENIED**.

## I.    BACKGROUND

This case arises out of Plaintiff Karen Corder's ("Plaintiff") employment with DFAS. (Doc. 14, Am. Compl. at ¶ 9). Plaintiff started with DFAS in 1989 as a temporary clerk typist. (Doc. 54-2, Corder Dep. at 15). After a few job changes throughout numerous years with DFAS, Plaintiff became a Budget Analyst with DFAS' Contracting Division, with a level 13 salary on

---

[1] Secretary of Defense Mattis shall be substituted for former Secretary of Defense Chuck Hagel under Rule 25(d) of the Federal Rules of Civil Procedure.

the General Schedule ("GS").[2] (*Id.* at 26). In 2008, DFAS, as part of an effort to reorganize, determined that Plaintiff was performing GS-12 duties. (*Id.* at 29–30). Fearing a possible mandatory reassignment to a new group, Plaintiff sought a GS-13 position with a new group. (*Id.* at 30–31). Plaintiff moved to a position as a Lead Financial Specialist for a program within the Desktop Management Initiative system ("DMI") called the Desktop Continuing Government Activity ("DCGA") program. (Doc. 49-1, Corder Aff. at ¶¶ 1–2).

As even those within DFAS admit, DFAS' organizational structure is confusing and is filled with overlapping groups and internal jargon. Accordingly, the Court attempts to lay out the structure before addressing Plaintiff's claims. Within DFAS are "directorates" and the one specifically at issue in this case is called the Information and Technology Directorate. (Doc. 45-18, Pre-reorganization Org. Chart; Doc. 54-4, McNutt Dep. at 11–13). To add to the confusion, the Information and Technology Directorate has its own sub-directorates which are also called directorates. (*Id.*). The sub-directorate at issue in this case is the Infrastructure Production Support Directorate ("IPS"). (*Id.*). IPS has three "divisions:" Infrastructure Engineering, Production Support, and Infrastructure Operations. (*Id.*). Under each division, there are branches which support the division. (*Id.*). Additionally, and confusingly, there are three major "systems" within IPS: DMI, the enterprise local area network ("ELAN"), and Teleservices. (Doc. 54-3, Lassen Dep. at 12). The systems are not organizational categories *per se*, but they generally fall under the three divisions and above the branches. Each system has its own manager. Last, there are also "programs" within IPS—such as the DCGA program for which Plaintiff worked—that support the systems.

---

[2] Both parties refer to positions as "GS-#" to designate a person's salary and the Court will do the same, e.g., "Plaintiff worked as a GS-13 Budget Analyst."

In 2011, James McNutt served as the Director of the IPS Group, Daryl Lassen was the Division Manager of Infrastructure Engineering, and Michael Moore was the Division Manager of Infrastructure Operations. At the time, the deputy director of the DCGA program was June Helligrath. *Id.* Helligrath performed the system management duties for DMI and was the acting DCGA supervisor, receiving GS-14 pay. (*Id.*). Working under Helligrath, Corder oversaw the budget for a contract which provided laptops and other computers to DFAS employees. (Doc. 54-2, Corder Dep. at 33, 37–38). In 2011, Moore asked Plaintiff to fully take over Helligrath's position after a period where Plaintiff was temporarily performing Helligrath's duties. (Doc. 49-1, Corder Aff. at ¶¶ 4–5). Plaintiff told Moore she did not want the systems manager and technical point of conduct duties and Moore informed Plaintiff that he would take over the technical point of conduct duties. (*Id.*). Plaintiff alleges that Moore never took over the duties and that she demanded that he do so or that she be elevated to a GS-14. (*Id.* at ¶ 6). Moore did neither. (*Id.*).

Around the same time, the Teleservices and ELAN system managers were replaced. (Doc. 49-1, Corder Aff. at ¶ 8). Norm Ott took over the system manager duties from Darryl Lassen. (*Id.*). Lassen kept the division management responsibilities of Infrastructure Engineering but Ott still received GS-14 pay. (*Id.*). Similarly, Robert Shreffler replaced Mike Leist as the system manager of Teleservices as a GS-14 but did not assume any division management duties. (*Id.*). Shreffler had been a teleservices branch supervisor but no longer performed those duties once he because the system manager.[3] (*Id.*). Corder had both system

---

[3] In May 2013, Banton replaced Shreffler as the system manager for Teleservices. (Doc. 54-1, Banton Dep. at 10). Banton had served as the supervisor of the engineering branch as a GS-13 but was elevated to GS-14 when he assumed the system manager position. (*Id.* at 12).

management duties over DMI and division management over the DCGA program.[4] (*Id.* at ¶ 9). At a later date, DCGA became a branch called Desktop Management Support (DMS). (*Id.*). DFAS does not dispute that Plaintiff is the only system manager who manages a branch beneath her own system. (Doc. 54-4, McNutt Dep. at 33).

In late 2011, McNutt and another DFAS employee, Joe Latchaw, led a restructuring project of IPS, with the goal of putting employees into a structure where all of those who supported the same system—i.e. ELAN, Teleservices, or DMI—worked within the same command structure under one manager. (Doc. 54-4, McNutt Dep. 20–22). The restructuring placed the majority of the system managers with the employees who were supporting the system being managed. (Doc. 54-4, McNutt Dep. at 26). McNutt attempted to place the system managers at the lowest organizational level possible based on the number of employees who supported the system. (Doc. 54-4, McNutt Dep. at 28–30). To accomplish this, McNutt split the supporting staff for each system into branches of twenty to twenty-five people. (*Id.*). If a system had more than one branch, the system manager would be put at the level of a division manager. (*Id.*). McNutt determined that Teleservices and ELAN required more than one branch while DMI only needed one branch. (*Id.*). McNutt used projections to determine that Teleservices would need two branches, not the current staffing numbers. (*Id.*).

While performing the restructuring, McNutt also devised a new method for determining whether a system manager should receive GS-13 or GS-14 pay. The new method was allegedly designed to "help [DFAS] differentiate the scope of the work that was done on our hundred— roughly 100 different systems." (Doc. 54-4, McNutt Dep. at 31). McNutt used a budget and

---

[4] At a later date, DCGA became a branch called Desktop Management Support ("DMS"). (Doc. 49-1, Corder Aff. at ¶ 9).

work years[5] threshold to determine the pay grade of each system manager, and essentially decided that if a system would require a budget of over $7.5 million and over 30 work years, the system manager should receive GS-14 pay. (*Id.*). The budget and work year determinations for the systems were made off of projections or forecasts of what would be necessary. (Doc. 54-4, McNutt Dep. at 30–32). Ultimately, both ELAN and Teleservices were projected to be above those thresholds and accordingly, Ott and Shreffler kept their GS-14 salary. Plaintiff, however, as the system manager of DMI, continued to receive a GS-13 salary, allegedly because McNutt only forecast eighteen employees for DMI. (Doc. 54-4, McNutt Dep. at 30).

Related to the new positions and pay methods, new position descriptions were written for Corder and the other system managers. Two DFAS employees testified that, generally, position descriptions were written after an employee's pay grade was already determined. (Doc. 53, Moore Dep. at 50–51; Doc. 54-3, Lassen Dep. at 39). Although Moore testified earlier that he "look[s] at all the positions descriptions and you pick one that—the closely matches what the person's responsibilities would be," he later admitted that in doing so, he works from a list of position descriptions for each pay grade level. (Doc. 53, Moore Dep. 36, 51).

In the years following the restructuring, McNutt's projections did not match reality for DMI and Teleservices.[6] In 2013, 2014, and 2015, Teleservices met the budget requirements but failed to achieve the requisite work years. (Doc. 49-6, DFAS Interrog. Resp. at 4). Although DMI did not meet the work year requirement in 2013, DMI met both requirements in 2014, and 2015. (*Id.* at 6). Throughout, Plaintiff remained at a GS-13 level despite the increase in work years required for DMI and her continued performance in the dual roles of branch manager and

---

[5] Neither party really explained the concept of "work years" but it appears to generally refer to an internal method of calculating the number of employees necessary in a given year.
[6] ELAN exceeded both goals in 2013 and 2014. (Doc. 49-6, DFAS Interrog. Resp. at 3).

5

system manager. (Corder Aff at ¶¶ 9, 11–12). McNutt was not aware of any system managers within DFAS who had supervision duties other than Corder. (Doc. 54-4, McNutt Dep. 50–51).

In 2016, after the filing of this lawsuit, DFAS determined that the method of determining pay grades for system managers was impermissible and thus, decided to review Plaintiff's job description to determine if her pay grade was correct. At some point, Amos Brown—the head of Infrastructure Operations and Plaintiff's supervisor—worked with a classification specialist to make a new job description for Plaintiff. (Doc. 54-4, McNutt Dep. at 53–54). At the time he prepared the new job description, Brown had only been Plaintiff's supervisor for a year and did not consult with her on her job description. (Doc. 49-1, Corder Aff. at ¶ 15). Amanda Roberson, a DFAS human resources director, determined that Plaintiff should be a GS-13 based on the major duties, responsibilities, and supervisory relationships Plaintiff had. (Doc. 45-1, Roberson Aff. ¶¶ 8–10). Plaintiff alleges that Brown's job description does not fully capture her job duties and responsibilities and that in reality, her job duties resemble those in the ELAN and Teleservices system manager job descriptions. (*Id.*).

Plaintiff began informally expressing her concerns to her bosses within DFAS about her salary starting in 2011. Plaintiff formally reported her concerns with her salary in 2013 and a Department of Defense investigator performed a fact finding conference on November 14, 2013. (Doc. 54-2, Corder Dep. at 71, Doc. 45-8). After both DFAS and DFAS EEO investigation failed to remedy her claims, Plaintiff filed suit in this case on April 4, 2014. Plaintiff's Amended Complaint now brings claims for violations of the Equal Pay Act ("EPA") and Title VII of the Civil Rights Act.

## II. STANDARD OF REVIEW

Defendants move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court's purpose in considering a summary judgment motion is not "to weigh the evidence and determine the truth of the matter" but to "determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A genuine issue for trial exists if the Court finds a jury could return a verdict, based on "sufficient evidence," in favor of the nonmoving party; evidence that is "merely colorable" or "not significantly probative," however, is not enough to defeat summary judgment. *Id.* at 249–50.

The party seeking summary judgment shoulders the initial burden of presenting the court with law and argument in support of its motion as well as identifying the relevant portions of "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56). If this initial burden is satisfied, the burden then shifts to the nonmoving party to set forth specific facts showing that there is a genuine issue for trial. *See* Fed. R. Civ. P. 56(e); *see also Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) (after burden shifts, nonmovant must "produce evidence that results in a conflict of material fact to be resolved by a jury"). In considering the factual allegations and evidence presented in a motion for summary judgment, the Court must "afford all reasonable inferences, and construe the evidence in the light most favorable to the nonmoving party." *Id*.

### III. DISCUSSION

Plaintiff brings two claims related to her pay grade determination by DFAS: (1) a violation of the EPA; and (2) a violation of Title VII of the Civil Rights Act for gender-based wage discrimination. Defendants argue that Plaintiff cannot provide evidence to support an EPA-based claim because she was not performing equal work to her comparators and that the pay differential was based on a merit system other than sex. Regarding the Title VII claim, Defendants argue that Plaintiff's job duties were not similar to her comparators and that there is a legitimate non-discriminatory reason for the pay disparity. Plaintiff disputes Defendants' arguments regarding both claims on legal and factual grounds, which will be discussed in greater detail below.

**A. Federal Equal Pay Act Claim**

The EPA provides that men and women performing "equal work" in the "same establishment" must receive "equal pay" unless the employer can justify a pay differential by pointing to a justification other than sex. 29 U.S.C. § 206(d)(1). A plaintiff alleging a violation of the federal equal pay statute must make a prima facie showing that (1) the employer paid different wages to male and female employees (2) for substantially equal work. *Corning Glass Works v. Brennan*, 417 U.S. 188, 195 (1974); *EEOC v. Romeo Cmty. Schs.*, 976 F.2d 985, 987 (6th Cir. 1992). "Whether a job is substantially equal for purposes of the EPA is determined on a case-by-case basis and "resolved by an overall comparison of the work, not its individual segments." *Beck-Wilson v. Principi*, 441 F.3d 353, 359–60 (6th Cir. 2006) (citing *Odomes v. Nucare, Inc.*, 653 F.2d 246, 250 (6th Cir. 1981)).

"'Unlike the showing required under Title VII's disparate treatment theory, proof of discriminatory intent is not required to establish a prima facie case under the Equal Pay Act.'" *Beck-Wilson*, 411 F.3d at 360 (quoting *Peters v. City of Shreveport*, 818 F.2d 1148, 1153 (5th

Cir. 1987), *abrogated on other grounds*, *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989)). If Plaintiff successfully proves the prima facie case, Defendants may "'prove' that the differential is justified under one of the four affirmative defenses set forth under § 206(d)(1) of the Equal Pay Act: (1) a seniority system; (2) a merit system; (3) a system which measures earnings by quantity or quality of production; or (4) any other factor other than sex." *Buntin v. Breathitt Cty. Bd. of Educ.*, 134 F.3d 796, 799 (6th Cir. 1998) (citing *Corning Glass Works*, 417 U.S. at 196). In the Sixth Circuit, these affirmative defenses must be proven by Defendants such that there remains "no genuine issue as to whether the difference in pay is due to a factor other than sex." *Id.* (citing *Romeo Cmty. Schs.*, 976 F.2d at 989). "Put another way: an 'EPA plaintiff bears the burden of producing evidence of pretext solely where a reasonable jury viewing the defendant's evidence could find only for the defendant.'" *Schleicher v. Preferred Sols., Inc.*, 831 F.3d 746, 753 (6th Cir. 2016), cert. denied, 137 S. Ct. 531 (2016) (quoting *Buntin*, 134 F.3d at 800 n.7).

   1.   **Equal Work**

Plaintiff argues that she has presented sufficient evidence to support her claims that she performs equal work for less pay than her male comparators under any criteria, that the differences cited by DFAS are inconsequential differences, and that some of the differences cited are factually in dispute. DFAS argues that Plaintiff's job requires less skill, less effort, less responsibility, and fewer certifications than the jobs performed by ELAN and Teleservices.

The EPA statute provides that "equal work" consists of jobs which "require equal skill, effort, and responsibility, and which are performed under similar working conditions." 29 U.S.C. § 206(d)(1). The Sixth Circuit has clarified that courts should focus "on actual job requirements and duties, rather than job classifications or titles." *Beck-Wilson*, 441 F.3d at 362 (citing *Brennan v. Owensboro–Daviess Cty. Hosp.*, 523 F.2d 1013, 1017, n. 7 (6th Cir. 1975)).

Further, at the prima facie stage, the Court only considers the skills and qualifications actually needed to perform the comparable jobs. *Id.* Plaintiff need not show that the jobs are perfectly equal, but rather that they are similar enough such that a jury could decide the jobs are substantially equal. *Id.* at 363.

As an initial matter, Defendants admitted in their Motion that the "system management functions of ELAN, Teleservices and DMI were essentially the same." (Doc. 45, Mot. at 12 (citing Doc. 54-4, McNutt Dep. at 58–59)). McNutt's testimony is particularly important as he oversees all three of the system managers at issue in this case. McNutt testified that the day-to-day job responsibilities for each system manager are essentially the same. (Doc. 54-4, McNutt Dep. at 58–59).

However, Defendants still argue that there are differences between Plaintiff and her comparators because the ELAN system manager provides strategic direction for security, new hardware, and long-range planning and that on some issues DMI falls under ELAN. Defendants argue that the Teleservices system manager also performs strategic planning for modernization and briefing. Specifically, Defendants cite Lassen's deposition, where he notes that for accreditation of systems, "if another agency is unhappy with how we've done the ELAN or the desktops or teleservices for the ELAN, they will go -- desktop, they will go to the ELAN system manager . . . ." (Doc. 54-3, Lassen Dep. at 17). Defendants also note that Plaintiff does not have the responsibility of reporting to the CIO as the ELAN and Teleservices system managers do. Comparing each system, Defendants emphasize the differences in complexity between the ELAN and Teleservices systems and DMI.

Plaintiff argues that the jobs are similar, noting that Lassen's testimony "refers to the preparation of certifications packages for system accreditation," and that Plaintiff is heavily

involved in that process. (Doc. 49, Mem. Opp. at 33). Plaintiff notes that she serves as the "User Representative for ELAN for the Defense Information Assurance Certification Accreditation Program . . . ." (*Id.* at 33). Plaintiff also argues that any differences cited by the Defendants are inconsequential because those differences have never formed the basis of any pay disparity at DFAS. Additionally, Plaintiff argues that she actually performs more work than her male comparators because she has supervisory duties and they do not. Last, Corder affirmed that she performs all of the job duties outlined in the ELAN and teleservices position descriptions. (Doc. 49-1, Corder Aff. at ¶ 11).

Defendant states that the pay disparity is created by "the differences in the[ system] functions and the skill, effort and responsibilities needed to perform those functions . . . ." (Doc. 45, Mot. at 12). But, it is undisputed that from the time of the reorganization in 2012 until this case was filed, the disparity in pay among system managers was created by 2012 budget and workload projections for each system, not the actual skill, effort, and responsibilities of each system manager. Further, the current position descriptions for Plaintiff's job and for the Teleservices System Manager's job list the same complexity level, the same scope and effect level, and the same level of personal and purpose of contacts. (Doc. 45-9, DMI Sys. Manager Pos. Description at 5–6; Doc. 45-10, Teleservices Sys. Manager Pos. Description at 5–6). Additionally, during the 2013 Fact Finding conference, Latchaw, when asked to explain the differences in complexity, stated that "the primary difference between [DMI and ELAN and Teleservices] is the number of government employees that are supporting the system." (Doc. 45-8, Fact Finding Tr. at 92). At the time, ELAN had between 70 and 90 employees, Teleservices had 30, and DMI had 10. Now, however, DMI has consistently required greater staffing than Teleservices, which, according to Latchaw, means that DMI is now significantly more complex

than Teleservices. (Doc. 49-6, DFAS Interrog. Resp. at 4, 6). Ultimately, from the evidence submitted by both parties, Plaintiff has presented sufficient evidence that she performs equal work to her male comparators.

2. **Affirmative Defenses**

Defendants argue that one of the statutory affirmative defenses applies in this case because the pay differential (both before and following the commencement of this litigation) was based on a factor other than sex. Defendants argue that Plaintiff's pay is currently based on the GS classification of her position and that previously, it was based off of the work years and budget criteria set forth during the reorganization. Plaintiff argues that the evidence shows that the reorganization criteria were not gender neutral because they did not account for changes to the figures in later years and were designed by Plaintiff's two male superiors.

The defense that the disparity in pay was based on a factor other than sex "does not include literally any other factor, but a factor that, at a minimum, was adopted for a legitimate business reason." *EEOC v. J.C. Penney Co., Inc.*, 843 F.2d 249, 253 (6th Cir. 1988) (citing *Bence v. Detroit Health Corp.*, 712 F.2d 1024, 1029–31 (6th Cir. 1983)). The defense is strictly interpreted and the Defendant must show that "'the factor of sex provides no part of the basis for the wage differential . . . .'" *Beck-Wilson*, 441 F.2d at 365 (quoting *Brennan*, 523 F.2d at 1031).

In this case, there is a genuine issue as to whether sex played a factor because even though Defendants identified a system by which Plaintiff and her comparators were paid differently, the system used by Defendants does not provide the sort of proof required to satisfy the affirmative defense. Plaintiff has identified facts showing that even when Plaintiff's system met the arbitrary standards set forth by Defendants, she still did not receive the same pay as her male comparators. Further, the system used by Defendants did not adjust her male comparator's

pay downward when Teleservices failed to meet the baselines. Again, this defense requires that the Defendant articulate some legitimate business reason for the pay disparity. McNutt testified that the employee/budget system was to help "differentiate the scope of the work that was done on our hundred -- roughly 100 different systems." (Doc. 54-4, McNutt Dep. at 31). If the goal was to differentiate the systems and there was a legitimate business purpose for using work hours and budget as the basis for the differentiation, then Defendants cannot show that there was a legitimate business purpose for continuing to pay the Teleservices manager as a GS-14 despite that system failing to meet the baselines while continuing to pay the DMI manager as a GS-13 when her system met those same baselines.

Defendants abandon the argument that the reorganization criteria were gender neutral in their Reply and instead argue that the Office of Personnel Management establishes the pay grades and thus, the gender neutral GS determines Plaintiff's pay. Defendants argue that Plaintiff's pay is dependent on her position description, "which describes management assignment of duties, responsibilities, and supervisory relationships . . . ." (Doc. 52, Reply at 6). Defendants argue that "Mr. Moore clearly stated that in selecting a position description he chose the one that matched the person's responsibilities." (*Id.* (citing Doc. 53, Moore Dep. at 36)). However, Moore clearly stated that if he is making a GS-13 position description, he would look through position descriptions that are just for the GS-13 jobs. (Doc. 53, Moore Dep. at 50–51). Defendants also cannot explain why Lassen testified that he also looks at the position descriptions for just GS-14s when a position has already been determined to be a GS-14.

> Q. When you're selecting a position description, what do you take into account? Are you looking simply -- do you just pick -- you know it's going a be a GS-14, so you just look under the GS-14 listed position descriptions and you pick the one that's closest or do you -- how do you do it?
>
> A. Look at the one that's closest.

> Q. Within the GS-14?
>
> A. Correct, within the GS-14 level going on what this area and the front portion of it -- for the duties to match up to what is being done by that GS-14.

(Doc. 54-3, Lassen Dep. 39).

Plaintiff also points to a portion of Moore's deposition where he noted that an earlier version of Plaintiff's position description did not actually include all of her duties. (Doc. 53, Moore Dep. at 45–46). Plaintiff also notes that her position description "shows significant differences between [Helligrath's] position [description] and the one held by Plaintiff." (Doc. 49-8, McGrath Expert Report at 31). As Plaintiff notes, Plaintiff's former supervisor admitted that she performed all of Helligrath's duties. (Doc. 49-10, Fact Find Tr. at 230).

In her affidavit, Corder stated that she does all of the duties listed in the current ELAN and Teleservices job descriptions and that her current position description does not fully account for all of her duties. (Doc. 49-1, Corder Aff. at ¶ 11). Again, Defendants attempt to argue that "Plaintiff fails to appreciate the complexity and scope the ELAN and Teleservices system manager positions require," but cannot explain why the position descriptions for Teleservices and DMI have identical scores for the "complexity" and "scope" factors. (Doc. 52, Reply at 6, Doc. 45-9, DMI Sys. Manager Pos. Description at 5–6; Doc. 45-10, Teleservices Sys. Manager Pos. Description at 5–6). Accordingly, Plaintiff has provided significant evidence that the position description does not match her current job description and Defendants have not provided any evidence that basing an employee's salary on an incomplete and/or incorrect position description serves any legitimate business purpose. Defendants Motion for Summary Judgment as to Plaintiff's EPA claim is **DENIED**.

### B. Title VII Wage Discrimination Claim

Next, the Court must consider Plaintiff's Title VII claims of gender discrimination on the basis that Defendants paid her less and required her to perform more work than her male colleagues.

Regarding the discrimination in unequal pay claim, as Defendants suggest, the standards of liability under both the EPA and Title VII are sufficiently similar that "'disposition with respect to the two claims should be the same.'" (Doc. 45, Defs.' Mot. at 19 (quoting *Crowder v. Railcrew Xpress*, 557 F. App'x 487, 494 (6th Cir. 2002)). The Court agrees. The Sixth Circuit has repeatedly held that "[a] finding of 'sex discrimination in compensation' under one Act is tantamount to a finding of 'pay discrimination on the basis of sex' under the other." *Korte v. Diemer*, 909 F.2d 954, 959 (6th Cir. 1990); *Clark v. Johnson & Higgins*, 1999 WL 357804, 181 F.3d 100 (6th Cir. 1999) (table). To be even more specific, the Sixth Circuit has held that "where the plaintiff defeats the defendant's motion for judgment as a matter of law with respect to her EPA claim by raising a genuine issue as to the defendant's reason for the differential wage, she also defeats their motion for judgment as a matter of law brought against her parallel Title VII claim." *Buntin*, 134 F.3d at 801. Accordingly, summary judgment as to Plaintiff's Title VII claim regarding her pay is **DENIED**.

Regarding Plaintiff's claim that she is performing more work than her male colleagues, Plaintiff provided evidence to support a prima facie claim of gender discrimination because she asserted that she is a member of a protected class, that she performs a job which Defendants admit should be split into two positions, and she received less pay than her male comparators who only work one job. Lassen, one of her current supervisors, admitted that at times, Plaintiff's work load is like having two jobs and that he believed the job duties should be split. (Doc. 54-3, Lassen Dep. at 30). Additionally, he testified that splitting the duties of each system manager

was one of the intentions of the reorganization. (*Id.* at 28–29). McNutt testified that he is not aware of any other system manager who has supervisory duties. (*Id.*).

Defendants attempt to explain Plaintiff's extra duties by insisting that Plaintiff accepted the job after the reorganization and that Plaintiff accepted the job knowing it came with more duties. However, the evidence does not support either of these arguments. First, Plaintiff assumed Helligrath's job in September 2011, before the reorganization in October 2011. (Doc. 49-1, Corder Aff. at ¶ 5; Doc. 54-4, McNutt Dep. at 17). Second, although Helligrath was already performing the duties of DMI system manager and DCGA manager, Plaintiff stated that Moore ensured her that she would not have both duties at the time Plaintiff accepted the position. (Doc. 49-1, Corder Aff. at ¶¶ 5–6). Plaintiff's argument is not that DFAS has heaped extra duties on her that her peers did not get, but rather that her peers had extra duties removed from their job but that Plaintiff continues to do the extra duties. Further, no DFAS employee has provided any reason why Plaintiff's supervisory duties have not been split apart like those of her male colleagues who receive higher pay. In fact, Lassen and McNutt explicitly stated that the job should be split and that they have the power to split the job. (Doc. 54-4, McNutt Dep. at 51; Doc. 54-3, Lassen Dep. at 30–32).

Defendants' legitimate non-discriminatory basis argument is that it was "oversight" that Plaintiff's job was not split. Oversight is not a legitimate non-discriminatory basis for requiring a woman to perform more duties than her male counterparts. Specifically, Plaintiff's complaints about her dual role from the time she accepted the job in 2011 to the filing of this case put Defendants on notice that her job should be switched. Further, as noted above, Lassen admitted that splitting such duties was one of the intents of the 2011 reorganization. (Doc. 54-3, Lassen Dep. at 28–29). Even if the Court accepted oversight as a legitimate, non-discriminatory basis,

Defendants' continued failure for five years to remedy a problem which they knew existed and had the power to change is sufficient evidence of pretext to overcome "oversight" as a non-discriminatory basis. Accordingly, Defendants' Motion is **DENIED** as to Plaintiff's claims under Title VII.

## IV.     CONCLUSION

Based on the foregoing, Defendants' Motion for Summary Judgment is **DENIED**. The Clerk shall **REMOVE** Document 45 from the Court's pending motions list. In light of this decision, the parties shall contact Magistrate Judge Jolson within **14 days** to arrange for participation in an upcoming Settlement Week or schedule a Mediation/Settlement Conference outside of a designated Settlement Week.

**IT IS SO ORDERED.**

  __/s/ George C. Smith_____
**GEORGE C. SMITH, JUDGE**
**UNITED STATES DISTRICT COURT**